UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CRIMINAL NO. 0:24-cr-00173-ECT-DLM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

**DEFENDANT'S SENTENCING MEMORANDUM**

SAID SHAFII FARAH,

Defendant.

## INTRODUCTION

The Government brought a three-count indictment against defendant Said Shafii Farah on June 25, 2024. The defendant pled guilty to Count 2, bribery of a juror in violation of 18 U.S.C. § 201, on August 21, 2025. Both the plea agreement and the PSI calculate the guideline range of imprisonment to be either 51 to 63 months of imprisonment or 63 to 78 months imprisonment, depending on whether the Court finds that Mr. Farah was a minor participant. The plea agreement also permits the defendant to argue for a sentence below the guideline range.

## FACTS OF THE OFFENSE

Mr. Farah was one of dozens of people charged in relation to the Feeding our Future fraud scheme. He is one of only two defendants to be acquitted of those charges. His trial began on April 22, 2024. The Government tried Mr. Farah along with six codefendants, including his brother Abdiaziz Farah. Unbeknownst to Mr. Farah, his brother Abdiaziz and another co-defendant, Abdimajid Nur, plotted from the beginning of the trial to bribe a juror.

According to the government's disclosures in this case, a juror list marked as number 7 went missing from the courthouse on April 25, 2024, three days into the trial. The missing juror

list had been on Mr. Nur's table during jury selection. The FBI later found the list in Abdiaziz's home during a search conducted on June 5, 2025. Abdiaziz Farah and Abdimajid Nur also researched Juror 52's personal information online including her address and Facebook account. PSI at 4. Mr. Nur's early theft of the jury list, the fact that the list was later found in Abdiaziz's home, and their online activity during the trial indicate that Abdiaziz and Mr. Nur planned the bribe for more than a month. Additional disclosures indicate that Abdiaziz and Mr. Nur continued to plot the bribe throughout the trial, including by recruiting Ladan Ali to fly from Seattle to Minneapolis to surveil the juror and ultimately deliver the bribe. PSI at 4-5.

All this plotting between Abdiaziz, Mr. Nur, and Ms. Ali was done without Mr. Farah's knowledge. In a text message he sent on May 28, 2024, Abdiaziz told Mr. Nur that "I am trying not to get Said even involved coz that f****r is shaky bro don't you agree." Exhibit 1 at page 7. In further text messages sent the evening of May 28, Abdiaziz went on to tell Mr. Nur that "Said is going crazy…The guy is a joke bro…That's why I was telling you ***I am not gonna ask him for anything or tell him anything***." **[Id. (emphasis added)].** As of May 28, Abdiaziz insisted to Mr. Nur that he "spoke with someone else bro" and "I have something else lined up…With a female I can trust but she doesn't know any of the details." **[Id].** The Government's disclosures clearly establish that Mr. Farah was not participating in the plan to bribe the juror and had no knowledge of the plan to bribe the juror while Abdiaziz and Mr. Nur plotted throughout April and May.

Although Abdiaziz planned to keep Mr. Farah ignorant of the bribe, Abdiaziz's plan fell apart late in the evening on Saturday, June 1, 2024. At that point in the trial, the jury had heard the Government's closing argument and the closing arguments of some of the defendants. The Court recessed for the weekend with plans to finish closing arguments and begin deliberations the following Monday. While Mr. Farah spent one of the most stressful weekends of his life working

in his grocery store and hoping for the acquittal he eventually received, Abdiaziz, Mr. Nur, and Ladan Ali continued with their plot to bribe the juror. Ms. Ali, who had been tasked with contacting the juror to initiate the bribe, falsely told Mr. Nur that she spoke with the juror in a bar and falsely claimed to have agreed upon a price of $500,000 for the bribe. PSI at 5.

Upon learning that the juror supposedly demanded $500,000, Abdiaziz abruptly changed his plan to keep Mr. Farah out of the conspiracy. PSI at 5. He believed he needed more money than he had available, so he decided to bring Mr. Farah into his scheme to assist in collecting the remaining funds. At 10:59 PM on Saturday, June 1, Abdiaziz texted Mr. Nur "Bro I gotta make calls." Phone records show that Abdiaziz called Mr. Farah at 11:03 PM. At 11:08 PM, Abdiaziz texted Mr. Nur, "Waiting on said [sic] to call me back bro…I told him they were going to find all of us guilty…so f*****g with his head." A few minutes later, Abdiaziz texted Mr. Nur, "It's all ready…Said is on it now as we speak." About an hour and a half later, at 12:56 AM, Abdiaziz texted Mr. Farah, imploring him to "Please have the money ready by 10 please. It's very important for everything we have." PSI at 5. The following morning, Mr. Farah collected a portion of the $200,000 raised for the bribe and, along with Abdiaziz, gave the money to Mr. Nur to be used for the bribe. PSI at 5.

**<u>DEFENDANT'S BACKGROUND</u>**

Mr. Farah is the oldest of nine siblings. He was born in Mogadishu in 1982 and fled with his father and five full siblings to Kenya when he was nine years old after his mother died during the ongoing civil strife in Somalia. PSI at 8-9. Upon arriving in Kenya, the family lived in a tent in a UN refugee camp where it fell to the motherless, nine-year-old Mr. Farah to care for his younger siblings while their father tried to eke out a living in the refugee camp. PSI at 9. The

youngest of Mr. Farah's siblings at the time was Abdiaziz. In the absence of their dead mother, it fell to Mr. Farah to care for his infant brother.

The family's fortunes improved when, about a year after their arrival in the refugee camp, Mr. Farah's father remarried and moved the entire family into a two-room apartment in Nairobi. Shortly afterwards, around 1994, Mr. Farah's father emigrated to America and left the twelve-year-old Mr. Farah to care for his younger siblings. PSI at 11. Mr. Farah, who never received any formal education himself, began working in Nairobi with the hopes that his income might enable his younger brothers Mohammed and Abdiaziz to attend high school.

In 2005, the entire family emigrated to the United States. PSI at 11. Mr. Farah began working as soon as he received work authorization. At first, he worked for wages in a print shop and for a telephone company, often working more than 16 hours per day. PSI at 11. He saved his wages and eventually opened a grocery store in 2009, followed by a second store in 2010. PSI at 11-12. He normally worked from the time that he opened his stores at 8:00 AM until the stores closed at 10:00 PM. A few years later, he bought a childcare center in Hopkins that he sold in 2018. PSI at 12. He used the proceeds from the sale of a daycare to purchase a commercial property called Laffey Plaza in 2018, which he operated until his arrest in 2024. PSI at 12. In addition to operating his commercial property, he also continued to operate a third grocery store. Because of his hard work, his brothers Mohammed and Abdiaziz finished not only high school but also college.

Mr. Farah was also able to start his own family. In 2011, he married his wife Ayan, with whom he has four children and one stepson. PSI at 12. The family lives a quiet and uneventful life in their Minneapolis home. Aside from his arrest in this case and the charges of which he was acquitted in the underlying Feeding our Future case, Mr. Farah has never been involved in the

criminal justice system, except for minor traffic and parking violations. PSI at 10. He has never otherwise been arrested or had adverse contact with law enforcement. Neither he nor anyone in his family has issues with substance abuse or mental health. PSI at 12. Until this case, his life was defined by hard work and the sacrifices he made to provide for his family, first for his little brothers and then for his own children.

## LAW AND ARGUMENT

The Court should vary from the guidelines and impose a sentence of less than 51 months upon Mr. Farah because varying below the guideline sentencing range will permit the Court to impose a sentence "sufficient, but not greater than necessary" to meet the sentencing goals of retribution, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. § 3553(a)(2). When imposing a sentence, district courts "should first determine the proper sentencing range under the Guidelines, then analyze whether any departure or variance from that range is appropriate, and finally apply the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Thundershield*, 474 F.3d 503, 506-07 (8th Cir. 2007). A district court must "take account of the Guidelines with other sentencing goals" including the requirement to "impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care." *United States v. Booker*, 543 U.S. 220, 245 (2005).

### I. The appropriate guideline range is 51-63 months because Mr. Farah was a minor participant in the offense.

The Court should find that the appropriate guideline range is 51-63 months because Mr. Farah was a minor participant. "A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range…As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."

*Gall v. United States*, 552 U.S. 38, 49 (2007) (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). In this case, both the PSI and plea agreement indicate that if the Court finds that Mr. Farah was a minor participant, then the total offense level is 24. PSI at 1, 16. Both the PSI and plea agreement also indicate that Mr. Farah has a criminal history category of I. PSI at 10. Therefore, if the Court finds that Mr. Farah was a minor participant, then the guideline range is 51-63 months. PSI at 16.

The Court should find that Mr. Farah was a minor participant. USSG § 3B1.2(b). A minor participant is someone "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* at cmt. 5. A defendant should receive a two-point downward adjustment for being a minor participant when his culpability "was relatively minor compared to that of the other participant or participants." *United States v. McWaters*, 139 F.4th 727, 729 (8th Cir. 2025). The Guidelines provide that "The determination whether to apply a [minor role adjustment] is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." USSG § 3B1.2 cmt. 3(C). The Court must consider all the facts of the case, including but not limited to: 1) the degree to which the defendant understood the scope and structure of the criminal activity; 2) the degree to which the defendant participated in planning or organizing the criminal activity; 3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; 4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and 5) the degree to which the defendant stood to benefit from the criminal activity. *Id.* Finally, "The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." *Id.*

Under Eighth Circuit law, the Court must identify the relevant conduct for which Mr. Farah is accountable, compare his conduct with that of other participants, and measure each participant's culpability against the elements of the offense. *United States v. Deans*, 590 F.3rd 907, 909-10 (8th Cir. 2010), *United States v. Cubillos*, 474 F.3d 1114, 1120 (8th Cir. 2007). Mr. Farah accepts this burden to establish the adjustment. The record meets it.

First, the Court should find that there is no evidence that Mr. Farah understood the scope and structure of the criminal activity. USSG § 3B1.2 cmt. 3(C)(1). The text messages between Abdiaziz and Mr. Nur clearly establish that Abdiaziz kept the entire plot secret from Mr. Farah until the very last minute, when Abdiaziz came to believe he would need access to additional money. Mr. Farah was unaware that Mr. Nur and Abdiaziz stole a juror list in April. He was unaware that Mr. Nur and Abdiaziz recruited Ms. Ali to surveil the juror during the trial. He was unaware that Ms. Ali travelled from Seattle to Minnesota to assist Abdiaziz and Mr. Nur with the plot. There is no evidence Mr. Farah even knew that his younger half-brother Abdulkarim was involved in any way. All these facts, and the evidence that Abdiaziz told Mr. Nur that he was "trying not to get Said even involved," supports the conclusion that Mr. Farah had little knowledge of the scope and structure of the conspiracy.

Mr. Farah was not identified as participating in any of that activity. The plea agreement places his entry into the offense on June 1, when Abdiaziz called in the late hours. The defense does not contend that Mr. Farah lacked knowledge once he agreed to assist. Rather, the relevant distinction is that he did not participate in the weeks of research, targeting, recruitment, surveillance, and logistical preparation that preceded his one-day role. That limited knowledge of the scheme's development and structure weighs materially in favor of minor-role treatment.

Second, the Court should find that Abdiaziz and Mr. Nur planned and organized the criminal activity, not Mr. Farah. USSG § 3B1.2 cmt. 3(C)(2). The evidence very clearly shows that Mr. Farah did not become involved in the conspiracy until the 11th hour, when Abdiaziz believed he would needed access to additional funds. While Abdiaziz and Mr. Nur planned the bribe, Abdiaziz specifically told Mr. Nur, as late as May 28, that "Said is going crazy…The guy is a joke bro…That's why I was telling you I am not gonna ask him for anything or tell him anything." Because Mr. Farah did not even know about Abdiaziz's and Mr. Nur's plan, he could not have participated in planning or organizing the bribe.

Third, the Court should find that Mr. Farah exercised limited decision-making authority. USSG § 3B1.2 cmt. 3(C)(3). It is evident from the Government's disclosures that Abdiaziz and Mr. Nur decided how the bribe would occur. Abdiaziz and Mr. Nur decided who to recruit into the conspiracy. Abdiaziz and Mr. Nur decided to have Ms. Ali surveil the juror during the trial. Ms. Ali decided how and when to surveil the juror. By comparison, Mr. Farah's decision-making authority was limited to locating and collecting some of the cash to be used in the bribe before Mr. Nur came to Mr. Farah's store to retrieve the cash.

Fourth, the nature and extent of Mr. Farah's participation in the conspiracy was limited. USSG § 3B1.2 cmt. 3(C)(4). The conspiracy lasted for well over a month, and Mr. Farah was only involved for the last day. His only role was to gather cash, and to provide it to others who used the cash in furtherance of the conspiracy. Another unindicted person also provided cash for the bribe, so not all the cash used in furtherance of the conspiracy came from Mr. Farah. PSI at 5. Mr. Farah did not participate in selecting the juror, researching the juror, surveilling the juror, or delivering the bribe to the juror. The extent of his involvement in the conspiracy was limited when

compared to Abdiaziz, Mr. Nur, and Ms. Ali, and the nature of his participation was limited because the only act he completed was to collect part of the funds to be used in the conspiracy.

Fifth, the Court should find that, although Mr. Farah stood to gain from the conspiracy, this factor is mitigated by the fact that Mr. Farah was acquitted of the underlying charges as well as by the fact that Abdiaziz appealed to Mr. Farah to participate in the conspiracy for the benefit of others, including Abdiaziz. USSG § 3B1.2 cmt. 3(C)(5). In fact, Abdiaziz texted Mr. Farah in the early morning hours of June 1 to "Please have the money ready by 10 please. It's very important for everything ***we*** have." (emphasis added). This appeal from Abdiaziz was undoubtedly calculated. Mr. Farah took care of his younger brother when Abdiaziz was a toddler in a refugee camp. Mr. Farah sacrificed his own youth and any opportunity he had for formal education to work and provide Abdiaziz with a life unavailable to himself. When the time came to convince his brother to help him with this plot, Abdiaziz knew that the way to do so would be to appeal to Mr. Farah's desire to protect and help his younger brother. Accordingly, although Mr. Farah also stood to potentially benefit from the bribe, the Court should find that this factor is mitigated by the fact that Mr. Farah – wrongly – believed that participating in the conspiracy was a benefit to the brother he has been providing for since their time together in a refugee camp.

Last, the Court should not give undue weight to any argument from the Government that Mr. Farah played a greater-than-minor role in the offense simply because the bribe could not have happened without Mr. Farah collecting a portion of the money. USSG § 3B1.2 cmt. 3(C). The fact that the bribe could not have occurred but for Mr. Farah's assisting with the collection of money does not determine his role in the offense. *Id.* In *United States v. Boksan*, the defendant received a 2-level reduction for being a minor participant after helping a drug trafficker by recruiting a courier to drive marijuana from Arizona to Connecticut. 293 F.3d 1056, 1057-58 (8th

Cir. 2002). The defendant's role was clearly indispensable because the courier would not have become involved in the scheme but for the defendant recruiting him, and the defendant continued assisting the drug trafficker by relaying messages to him from the courier, including a message about how the rented U-Haul containing the drugs had broken down in route. *Id*. Despite these critical services on behalf of the conspiracy, the Court of Appeals upheld the district court's decision to grant the defendant a two-level reduction for having a minor role in the offense because the defendant clearly played a lesser role in the offense than the drug trafficker did. *Id*. at 1059. Similarly, even though Mr. Farah's act of obtaining cash later delivered to the juror was essential to the offense, the Court should not find that it is determinative. Instead, the Court should find that Mr. Farah's contribution to the conspiracy was "relatively minor compared to" Mr. Nur's contribution, Abdiaziz's contribution, and Ms. Ali's contribution. *McWaters*, 139 F.4th at 729.

Section 3B1.2 does not make the importance of an assigned task dispositive. A defendant who performed an essential function may still receive the adjustment if he is substantially less culpable than the average participant. Here, the record demonstrates that Mr. Farah's function was limited: he was asked to collect cash late in the scheme and passed the cash to the participant who then managed its transfer to the courier. The fact that a defendant performs an essential or indispensable role in criminal activity is not determinative. Mr. Farah's involvement is more like that of his younger brother, who was found to be a minor participant in the conspiracy to bribe Juror 52. He too was kept out of the conspiracy until the last moment. Yet he played a role in facilitating the crime. He drove a co-conspirator to Juror 52's home and recorded a video of the transaction. He provided that video to Abdiaziz. Prior to driving to Juror 52's home he travelled to a store to obtain a screwdriver to remove the license plates so they could not be detected. His presence was necessary to make sure that Ladan Ali did not steal the money and delivered the

proceeds to Juror 52. Defendant does acknowledge that Abdulkarim Farah was not going to receive benefit from this conspiracy, but at the same time Mr. Farah was acquitted of his charges in the underline fraud case.

Mr. Farah should be treated as a minor participant as was his co-defendant Abdulkarim Farah. Mr. Farah is not seeking a four-level minimal-role adjustment. He knowingly rendered assistance. But the 3B1.2(b) question is whether he was less culpable than most other participants in the criminal activity. The evidence demonstrates that he was: he joined the scheme only after others had developed it and begun its execution, he exercised no planning, managerial, or operational authority; he neither interacted with nor targeted the juror; and he did not recruit, instruct, or supervise the courier or surveillance team. The Court should apply the two-level minor-participant adjustment, calculate a total offense level is 24 and criminal history category is 1, and find an advisory guidelines range of 51 to 63 months.

## II. The facts of this case and of Mr. Farah's personal history justify a variance below the guideline range.

The Court should vary below the guideline range in sentencing Mr. Farah. After determining the guideline range, the Court must "analyze whether any departure or variance from that range is appropriate." *Thundershield*, 474 F.3d at 506-07. In deciding whether to vary from the guideline range, district courts must consider both the nature and circumstances of the offense as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The district court must also consider the kinds of sentences available, the applicable sentencing range under the guidelines, any policy statements issued by the Sentencing Commission, the need to avoid unwarranted sentencing disparities among defendants who are similarly situated, and the need to provide restitution where applicable. 18 U.S.C. §§ 3553(a)(1)-(7). "A district court has substantial discretion in determining how to weigh the § 3553 factors," including facts of personal history and

characteristics such as family life, education, and mental health or substance abuse issues. *United States v. Zambrano*, 971 F.3d 774, 783 (8th Cir. 2020) (citing *United States v. Morais*, 670 F.3d 889, 893 (8th Cir. 2012)). After weighing all these factors, district courts are required to impose a sentence "sufficient, but not greater than necessary" to meet the sentencing goals of retribution, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. § 3553(a)(2).

A. The nature and circumstances of the offense.

Mr. Farah accepts responsibility for agreeing to help collect money for a bribe directed at a juror. He understands that conduct was illegal, harmed the juror, and undermined the judicial system. He does not minimize its seriousness. But the record also distinguishes Mr. Farah's conduct from that of the participants who initiated and organized the offense.

The Court should find that a sentence of less than 51 months in prison would be sufficient punishment given the nature and circumstances of Mr. Farah's offense. 18 U.S.C. 3553(a). The Court should consider that Mr. Farah did not conceive of this plan and did not become a participant in the scheme until very late. The evidence shows that he agreed to provide funds after his brother Abdiaziz "f****d with his head." Abdiaziz is the same brother who Mr. Farah took care of while their family lived in a refugee camp. PSI at 11. Abdiaziz is the same brother who Mr. Farah provided for during the years that they lived in a tiny apartment in Kenya, and Abdiaziz is the brother for whom Mr. Farah sacrificed his own education so that he could work and provide his brother with an opportunity to go to school. Mr. Farah has acknowledged that he committed a crime when he agreed to help his brother, but the Court should consider that the circumstances of Mr. Farah's offense were different than the circumstances that motivated Abdiaziz, Mr. Nur, or Ms. Ladan. In light of the particular circumstances surrounding Mr. Farah's offense, and in light of the fact that he committed the offense at the behest of a brother who he has taken care of since

they were refugees as children, the Court should find that a sentence shorter than 51 months would be sufficient.

B. Mr. Farah's personal history and characteristics.

The Court should vary from the guideline range of 51-63 months and impose a sentence of less than 51 months because such a sentence would be just, considering Mr. Farah's personal history and characteristics. 18 U.S.C. 3553(a)(1). Mr. Farah has lived an impressive life since his immigration to America. Despite his lack of formal education, he became fluent in English. After working for wages upon arriving in America, he opened his own grocery store and went on to operate, at various times, three grocery stores, a daycare, and a commercial building. His younger brothers, who he has provided for over the years, look up to him as a role model. PSI at 12. He is well known in his community, and he has formed a stable and happy family with his wife and five children.

He has done all of this without causing any trouble during his time in the United States. Until this offense, he was never convicted of any crime and only had minor contact with law enforcement for traffic and parking violations. PSI at 10. He has no substance abuse or mental health issues. Because he has never been in custody before, the PSI notes that "any prison term imposed in this case, including a term below the determined range, would be a significant graduated sanction." PSI at 18. Accordingly, the Court should find that Mr. Farah's personal history and characteristics justify a variance below the guideline range because Mr. Farah is a hardworking family man who has never caused trouble until he made the wrong decision to try to help his little brother Abdiaziz with a scheme he never would have considered on his own.

C. A sentence under 51 months would be sufficiently retributive.

The Court should find that a sentence shorter than 51 months would provide just punishment. 18 U.S.C. § 3553(a)(2)(A). "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." 481 U.S. 137, 149 (1987). In this case, a sentence under 51 months would adequately reflect the seriousness of Mr. Farah's conduct. The facts are that Mr. Farah did not plan the bribe, did not select the juror, did not surveil the juror, did not contact the juror, and did not go to the juror's home. He wrongly agreed to assist others in collecting some of the funds that were used for the bribe, but he did so only after his younger brother called him to plead with him and implore him that it was "very important for everything we have." PSI at 5. Mr. Farah acknowledges that his decision to help his brother commit a crime was wrong. He asks the Court to consider that this is the same brother who he cared for as a baby in a refugee camp, and it is the same brother for whom he sacrificed for many years so that his brother could go to school and obtain an education which was never available to Mr. Farah. Given these facts and given the extent of Mr. Farah's involvement in the conspiracy, a sentence of less than 51 months would be adequate retribution.

D. There is no further need to deter Mr. Farah.

The Court should find that there is no need to deter Mr. Farah from committing any further crimes. 18 U.S.C. § 3553(a)(2)(B). The Court must consider "the need for both general and specific deterrence." *Id.*; *see also United States v. Kloss*, 769 F.3d 558, 565 (8th Cir. 2014). The Eighth Circuit has upheld longer sentences in cases where a defendant's longer criminal history demonstrated a need for specific deterrence. *See United States v. Haskins*, 101 F.4th 997, 1000 (8th Cir. 2024). For example, in *Haskins*, the district court imposed an upwards variance of 63 months to the statutory maximum for a defendant convicted of felon in possession of a firearm

because the defendant had previously been convicted of a murder involving a firearm, an assault, and another felon-in-possession charge, and his conviction on the case for which he received the upward variance also involved possession of drugs. *Id.* at 999. On appeal, the Eighth Circuit found that the upward variance was, in part, justified by the need to specifically deter a defendant who had repeatedly violated the law. *See id.*

If an extended criminal history can be grounds for a court to find greater need for specific deterrence, then a minimal criminal history should be grounds for a court to find minimal need for specific deterrence. *See id.* This is a case where the defendant has no criminal history. In contrast with the defendant in *Haskins*, Mr. Farah has never been convicted of any other crime. He has not committed a string of crimes that suggest prior sentences have inadequately deterred him. Instead, he has experienced a significant length of time already spent in Sherburne County Jail that is, without any further punishment necessary, a significant deterrent to future wrongdoing. As noted above, Mr. Farah's total lack of prior involvement with the criminal justice system has rendered his time in custody a "significant graduated sanction." PSI at 18. Accordingly, the Court should find that a sentence under 51 months will be more than adequate to specifically deter Mr. Farah from any future wrongdoing.

E. A sentence under 51 months would provide adequate general deterrence.

The Court should find that a sentence of less than 51 months will provide adequate general deterrence. 18 U.S.C. 3553(a)(2)(B). General deterrence has been described as "one of the key purposes of sentencing" and demonstrates the district court's "desire to send a message." *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010). However, the Department of Justice's National Institute on Justice, which describes itself as "the research, evaluation, and technology agency of the U.S. Department of Justice" which "is dedicated to improving knowledge

and understanding of crime and justice issues through science" has published studies finding that imposing lengthy sentences of the purpose of general deterrence is largely ineffective. *See* National Institute of Justice, *About the National Institute of Justice* (Feb. 3, 2025) (available at: https://nij.ojp.gov/about). According to the DOJ's research agency, "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime." National Institute of Justice, *Five Things About Deterrence* (June 5, 2026) (available at: https://nij.ojp.gov/topics/articles/five-things-about-deterrence#two). The National Justice Institute has further stated that "Increasing the severity of punishment does little to deter crime." *Id.*; *see also* Nagin, Daniel S., "Deterrence in the Twenty-First Century," in Crime and Justice in America: 1975-2025, ed. M. Tonry, Chicago, Ill.: University of Chicago Press, 2013: 199-264.

Given that the Department of Justice has acknowledged the inefficacy of lengthy prison sentences in serving the purpose of general deterrence, the Court should find that a sentence of less than 51 months adequately sends the message that participation in a scheme to bribe a juror will result in severe consequences. Moreover, the Court should find that imposing any prison sentence on a person who has no prior criminal history and who has never been to prison or even been on probation adequately conveys to the public that the Court will harshly sanction any other member of the public who endeavors to commit a similar offense.

F. <u>There is no need to incapacitate Mr. Farah</u>.

The Court should find that there is no need to incapacitate Mr. Farah. 18 U.S.C. § 3553(a)(2)(C). A sentencing court must consider the need "to protect the public from further crimes of the defendant." *Id.* In this case, there is no need to protect the public from further crimes because Mr. Farah has never been convicted of any other crimes. PSI at 8-9. His only contact with law enforcement related to 5 traffic citations. *Id.* Since his entry into the United States, he

"has started a family, created several businesses, and primarily led a pro-social lifestyle." PSI at 15. The pro-social lifestyle Mr. Farah has led, and the absence of any other criminal convictions, evinces the lack of need to incapacitate him, and the Court should find that a sentence of less than 51 months would be more than sufficient to protect the public.

G. There is no need to rehabilitate Mr. Farah.

The Court should find that there is minimal need to rehabilitate Mr. Farah. 18 U.S.C. 3553(a)(2)(D). The Court must consider the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." In this case, there is no evidence that Mr. Farah needs any such training, care, or treatment. He is not chemically dependent. PSI at 13. He has no mental or physical health issues that require treatment. PSI at 12. The PSI concluded that he lives a pro-social lifestyle, as evidenced by his stable family life and creation of several businesses. PSI at 15. Although he has participated in every program possible while in Sherburne County jail, there is no issue in his life that suggests he needs to complete such programming. Similarly, although he takes pride in working towards his GED while in custody, his lack of an education clearly has not prevented him from leading a professionally successful life since his arrival in America. Based on Mr. Farah's general good health, on his lack of criminal history, and on the pro-social life he led before this offense, the Court should find that there is minimal need for rehabilitation and no need to impose a prison sentence to achieve rehabilitation.

H. Other factors that support a variance.

The Court Should Account for the Imminent Amendment to the §2B1.1 Loss Table in determining the appropriate sentence. The Court should calculate the advisory range under the Guidelines in effect on the date of sentencing. 18 U.S.C. § 3553(a)(4)(A)(ii). But the Court should

also account for the Sentencing Commission's already-adopted amendment to the loss table that will become effective on November 1, 2026, absent congressional action. 18 U.S.C. § 3553; U.S. Sentencing Commission, 2026 Amendments, Amendment 2.

The amendment matters directly here. Section 2C1.1(b)(2) determines the enhancement for bribery offenses by incorporating the §2B1.1 table corresponding to the greatest applicable amount—here, the asserted $200,000 payment or intended payment. The conspirators obtained approximately $200,000 in cash to be delivered and paid to Juror 52 as a bribe in exchange for a not guilty verdict in the criminal trial but only $120,000 was delivered to Juror 52's home. Under the table in effect at sentencing, an amount exceeding $150,000 produces a 10-level increase. U.S.S.G. §2B1.1(b)(1). Amendment 2 moves the 10-level threshold to an amount **more than $200,000**; an amount of exactly $200,000 instead receives an 8-level increase. U.S. Sentencing Commission, 2026 Amendments, Amendment 2.

The Court should therefore grant a two-level downward variance, equivalent to the enhancement that will govern this same $200,000 amount shortly after sentencing. This is not a request to apply a not-yet-effective Guideline as the formal calculation. It is a request that the Court recognize the Commission's considered and imminent recalibration when deciding the sentence that is sufficient, but not greater than necessary, under §3553(a).

That approach is permitted by controlling Eighth Circuit law. In *United States v. Allebach*, 526 F.3d 385 (8th Cir. 2008), the court held that consideration of a then-pending Guidelines amendment is permissible, although not mandatory, and explained that a forthcoming amendment may inform whether an outside-Guidelines sentence is reasonable. The Supreme Court likewise requires the sentencing court to correctly calculate the current advisory range first, then make an individualized determination under all §3553(a) factors; the Guidelines are the starting point, not

the end of the analysis. *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220 (2005). A court may also conclude that an advisory Guideline result is greater than necessary when it conflicts with §3553(a)'s purposes, particularly where the Commission itself has amended the relevant sentencing policy. *Kimbrough v. United States*, 552 U.S. 85 (2007).

The requested variance is modest, objectively defined, and grounded in a Commission amendment—not an ad hoc disagreement with the Guidelines. It prevents the fortuity of a sentencing date only weeks before the amendment's effective date from producing two additional offense levels for conduct whose relevant amount is exactly $200,000. Accounting for that imminent, nationally applicable sentencing policy better serves the parsimony mandate and avoids an unwarranted disparity between Mr. Farah and otherwise similarly situated defendants sentenced after November 1, 2026.

Mr. Farah would ask this Court to consider two other factors when considering a sentence outside of the guidelines. The jail conditions he has been living in since his arrest and an incident where his family's home was targeted and shot at while his wife and children were home and he was in custody.

Mr. Farah's presentence custody has been materially more punitive than ordinary detention. He has been confined in a local jail that provides **no meaningful outdoor recreation or outside time**. He has also endured substantial lockdown periods that confine him to his housing unit or cell and sharply limit movement, recreation, programming, and ordinary human contact. These are not incidental inconveniences of custody. They determine the actual severity of the punishment Mr. Farah has already served.

Mr. Farah has been in custody at the Sherburne County Jail since his arrest. His time at Sherburne County Jail should be considered "hard time" because of the conditions the inmates are subjected to. As the Court is aware, inmates in this jail are not allowed time outside. That means no sun, no fresh air, and lock-down for substantial periods of time. The cell he lives in is approximately 7x7 feet. He has had a roommate the entire time; therefore, the entire time he has been in custody he has had no privacy. The bathroom is just a foot from where he sleeps. We would ask the Court to consider this when determining an appropriate sentence. Sherburne County also has a gun range so pretrial detainees housed at this facility frequently hear gunshots, making it difficult for inmates to relax.

Mr. Farah does not contend that every local-jail restriction independently establishes a constitutional violation or entitles him to a mechanical day-for-day reduction. The point is narrower. His local detention—with no outside time and substantial lockdown—has made each day of presentence custody substantially more onerous than the ordinary custodial experience presumed by the Guidelines. A modest downward variance would recognize that reality, provide just punishment, and ensure that the aggregate term of incarceration is no greater than necessary. The Court should account for these conditions when selecting a sentence below the advisory range.

Mr. Farah also had to deal with his family's home being shot by a random person while he was sitting in jail. On December 24, 2025, at 2:00 am, while his wife and five of his children slept, two bullets penetrated a wall and window at his residence. His family has not received any information from law enforcement about the incident, and his family continues to live in fear. It would be extremely difficult for the family to relocate while Mr. Farah is in prison. Mr. Farah was the main financial provider, and the longer he is in custody, the more difficult it will be for him to relocate his family to a safer location.

Having considered all the relevant factors under 18 U.S.C. 3553, the Court should find that a sentence less than the guideline range of 51-63 months would be sufficient and not more than necessary. Mr. Farah's personal history demonstrates that he will not offend again and explains why he agreed to participate in his brother's scheme. The nature and circumstances of Mr. Farah's participation in Abdiaziz's scheme clearly merit some punishment, which Mr. Farah has conceded by pleading guilty. However, the Court should find that the minimal need for specific deterrence, incapacitation, and rehabilitation weigh heavily in favor of granting a variance below the guidelines range, particularly because the execution of a prison sentence upon someone like Mr. Farah, who has never been convicted of any crime, is significant retribution and reflects the seriousness of the offense.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests this Court to use the 2026 amount of loss changes, resulting in a two-point reduction, find that he was a minor participant, find that the guideline range is 51-63 months, and find that a sentence below this guideline range will be sufficient to ensure just punishment.

**OLSON DEFENSE**

Dated: September 17, 2026

/s/ Eric J. Olson
Eric J. Olson
Atty. Id. # 278427
Attorney for Defendant
8009 34th Ave. S., Suite 1492
Bloomington, Minnesota 55425
(952) 835-1088